

**NUMBER 13-12-00006-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF C.T. AND K.T., MINOR CHILDREN

### On appeal from the 94th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

This is an appeal of the termination of parental rights to C.T. and K.T., two minor children. Appellants are: Alice, the biological mother of C.T.; Christina, the biological mother of K.T.; and Paul, the father of both children.[1] Paul argues that: (1) the evidence was insufficient to support the jury's findings regarding five different criteria enumerated in family code section 161.001, *see* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011); (2) the evidence was insufficient to show that termination was in the best

---

[1] To protect the privacy of the parties, we refer to the children by their initials and to appellants by fictitious names. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2011); TEX. R. APP. P. 9.8(b)(2).

interests of the children; (3) the trial court violated the notice and verification provisions of the Indian Child Welfare Act ("ICWA"); (4) the trial court erred in admitting certain testimony; and (5) he was deprived of his right to a fair trial because opposing counsel was acquainted with one of the jurors. Christina joins in Paul's evidentiary sufficiency issues and also contends that: (1) the jury charge deviated from statutory language and therefore deprived her of due process; and (2) she was afforded ineffective assistance of counsel. Alice joins in Paul's issues regarding the sufficiency of the evidence under family code section 161.001 and ICWA notice, and she also contends that the trial court lacked personal jurisdiction over her.[2] We affirm as modified.

## I. BACKGROUND

C.T. was born on March 26, 2000, to Paul and Alice. K.T. was born on March 29, 2009, to Paul and Christina. As of 2010, Paul and Christina lived together with the two children. On June 16, 2010, the Department of Family and Protective Services (the "Department") filed petitions to terminate the appellants' parental rights with respect to C.T. and K.T. A trial was held before a Nueces County jury from November 28 to December 2, 2011. The following facts were established at trial.

### A. Michael Ilse

Corpus Christi Police Department officer Michael Ilse was dispatched to Driscoll Children's Hospital on June 15, 2010. He arrived to learn that ten-year-old C.T. was being treated for second- and third-degree burns to her back, buttocks, and legs. Paul informed Officer Ilse that C.T. had burned herself in the shower "several days earlier." Paul said that he "did do some treatment" on her but "then it got to the point" where he felt she needed to be seen at a hospital. Christina, who arrived at the hospital later,

---

[2] We have rearranged and renumbered appellants' issues for the sake of clarity.

also told Officer Ilse that C.T. had burned herself with scalding hot water in the shower several days earlier. At the hospital, Officer Ilse viewed pictures of C.T. that showed what "appeared to be belt marks" on her body. According to Officer Ilse, Paul "said he does spank [C.T.], and he did spank her that previous week; and it was likely that he could have given her those marks, but he wasn't sure."

Paul consented to a search of the family's apartment. Officer Ilse noted that the apartment was clean, but while K.T.'s bedroom looked "like a child's room would look," C.T.'s bedroom had only an air mattress on the floor with no sheets or blankets on it. Officer Ilse stated: "That was a very big concern for me when I—going from [K.T.]'s room seeing everything they had there and going into [C.T.]'s room. There w[ere]n't even sheets on the mattress."[3] C.T.'s room did, however, contain "first aid items" as well as a shirt and towel that appeared to have blood and dirt stains on it. There was also blood on the floor, trash can, and toilet in the bathroom that C.T. used. Officer Ilse asked the parents about the source of the blood; Christina claimed that it was C.T.'s menstrual blood. Crime scene technicians measured the temperature of the water coming from the shower in the bathroom that C.T. used. Officer Ilse recalled that the temperature of the water coming out of the shower "reached up to about 140 degrees in a minute."

---

[3] Officer Ilse stated that the difference in the appearance of the bedroom was a "red flag" and he elaborated as follows:

> [I]nitially, I thought what I was looking at was what is called a targeted child, and a targeted child is when you might have more than one child in a home and parents pick on one particular child because maybe they're not related to them, maybe that child is sickly, you know, or is different than the other child. And in this particular case, I believe it's because [K.T.] was related to both [Paul] and [Christina], and—and [C.T.] was— . . . only [Paul]'s.

On cross-examination, Officer Ilse acknowledged that the family had just moved into the apartment the prior month, and that Paul stated he was waiting for a bonus check, which he would have used to purchase furniture for C.T.'s room.

Paul and Christina were taken to the police station for questioning. Officer Ilse noted that C.T. participated in two videotaped interviews with the Children's Advocacy Center ("CAC")—one at Driscoll Hospital and one after C.T. had been transferred by helicopter to the burn unit at Shriners Hospital in Galveston. In those interviews, C.T. reported that Paul and Christina had hit her with a belt and burned her in the shower. As a result of those accusations, Officer Ilse filed criminal charges against Paul and Christina for causing serious bodily injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2011).

## B. Julie Denney

Julie Denney, a forensic nurse examiner, testified that she examined C.T. at Driscoll Children's Hospital. Denney found a total of 33 injuries on C.T., including bruises, cuts, a 60-by-40-centimeter burn area on her back, and red streaking on her legs which were consistent with hot water burns. C.T. informed Denney that "I was taking a shower and the water was too hot. I hit myself with my fists because I was in pain." C.T. also told Denney that "I walked into a wall and hit my face" and "My sister scratched my face." Appellants were not present at the time C.T. made these statements. Denney agreed with counsel that, in her experience, children "sometimes start off basically hiding the truth and then progressively com[e] out with the truth."

## C. Christina

Christina testified that she was convicted on four counts of causing injury to a child and is currently incarcerated. She has been in a relationship with Paul since 2008 and gave birth to their daughter, K.T., in 2009. A court awarded Paul custody of his other daughter, C.T., in February 2010; prior to that, C.T. had been living with her paternal grandmother. Paul's mother did not approve of his relationship with Christina.

4

According to Christina, C.T. was happy living with Paul and Christina, and she did not want to go back to living with her grandmother. Christina denied ever physically abusing C.T.

Christina explained that, on June 10 or 11, 2010, a notice was posted on the door of her apartment advising residents of a problem with the apartment complex's water heater, and notifying residents that the water may be hotter than normal. According to Christina, "the longer you would be in the shower, the water would start getting hotter and hotter. So we had to adjust the water to colder each time." Christina stated that she warned C.T. about the problem. Christina then testified as follows with respect to the events of June 12, 2010:

> [C.T.] got into the shower. I want to say it was Saturday, maybe about 2:00 in the morning[4], and the first shower lasted about 20 minutes. When I went to go check on her, she said—I asked her if she had taken a shower properly, and [C.T.] said no, that she hadn't washed herself properly. I then told her to take another shower. I closed the door to the restroom.
>
> I went to the kitchen, and I was in the kitchen maybe about not even a minute. I went to go check on our little girl and within that time I heard [C.T.] saying, "It stings. It stings." And I thought it was the soap or maybe something in her eye. I didn't think anything about the water. Then as she said it again, I heard it in her voice. The tone was different.
>
> I heard her crying. That's when I ran to the restroom. I opened the door, and I see [C.T.] pinned up against the wall, and I checked the water and the water is scalding hot. . . . When I looked at the knob, the knob was on hot, and I just turned it to cold.

Christina stated that she then checked C.T.'s body, but she did not see any discoloration or anything else out of the ordinary.

The next day, Christina noticed that C.T. was in pain, and C.T. stated that her

---

[4] Christina testified that Paul worked night shifts, and so the family would regularly spend time together at odd hours.

5

back hurt. When Christina lifted up C.T.'s shirt, she "saw a bunch of little blisters." She described what she saw to police as "a horror show." She notified Paul but did not take C.T. to the hospital at that point. She administered Tylenol and applied antibiotic ointment and gauze. Christina stated that C.T. behaved normally for the rest of that day. She asked if C.T. was in pain, and C.T. said no. Christina stated that she did not take C.T. to the hospital at that time in part because Christina had suffered a miscarriage only two weeks earlier and was not allowed to lift heavy items or walk up stairs. Moreover, Christina testified that when she "mentioned the hospital, [C.T.] would cry and she said she didn't want to go to the hospital."[5]

The following Tuesday, however, "the blisters started oozing and the top layer of the skin started coming off." At this point, according to Christina, she realized that C.T. had suffered burns from her shower three days earlier, and so she and Paul decided to take C.T. to the hospital. Counsel for the Department asked Christina whether "leaving [C.T.] untreated with what ultimately became second and third degree burns . . . for more than four days caused her physical danger and . . . emotionally abused her?" Christina replied: "She wasn't left untreated. We did everything we could over-the-counter. We didn't know the severity of the burns. Once we knew that it was worse, we proceeded to take her to seek proper medical attention." Christina stated that she "was raised on at-home remedies" and "never grew up on going to a hospital." She said: "[I]f I got hurt my grandmother and my mother would fix me at home. We never had the means or wealth of going to the hospital. So when [C.T.] was burned, I thought the best interest for me to help her [sic] was to put medication and gauze [on the burn]."

---

[5] Counsel for the Department asked whether Christina decided not to take C.T. immediately to the hospital because "[C.T.] was covered in bruises and you did not want to get in trouble"; Christina said no.

Christina denied that she would discipline C.T. if C.T. failed to do chores. According to Christina, Paul would discipline C.T. if she misbehaved. She was aware that Paul had spanked C.T. with a belt; however, she denied that Paul ever spanked C.T. with his work belt that he used as a corrections officer.[6] When asked why C.T. appeared at the hospital with "at least 33 injuries," Christina said: "I can't explain it. When I saw [C.T.] with no clothes on, I, myself, asked her where those bruises came from; and she said she didn't know." Later, Christina testified that she asked C.T. about the bruises on her legs, and C.T. replied that "she hit herself because she was in pain."

When asked about the difference in the appearance of the girls' bedrooms, Christina noted that most of the items in K.T.'s room were gifts that she received from baby showers. She said that C.T. slept on a couch or air mattress and had pillows, blankets, and sheets. She said that the spartan appearance of C.T.'s room was only temporary; that C.T. had picked out furnishings for her room from Sears; and that they were going to "pick up" the furnishings as soon as Paul received an expected bonus check.

Christina stated that the Department took custody of the children in June 2010. She was not allowed to see K.T., C.T., or Paul. At the time of trial, K.T. was living with Christina's uncle and his wife, both of whom have stable jobs.[7] Christina acknowledged that the Department had provided a service plan, which she signed, that required her to attend parenting classes, to attend anger management classes, to submit to a psychological exam, and to seek family and individual counseling. Christina stated that

---

[6] She reasoned that, if Paul ever hit C.T. with his work belt, there would have been cuts as well as bruising because there were metal pieces on the belt.

[7] Christina also testified that K.T. had been placed with Paul's mother prior to living with Christina's uncle and wife. Christina stated that, when she was in the care of Paul's mother, K.T. suffered "a busted lip and a busted nose."

7

she finished the parenting class, underwent a psychological exam, and started the anger management class and counseling but couldn't finish them because she was already convicted and incarcerated.

## D.    Dr. Arceneaux

Lisa Arceneaux, Ph.D., a pediatric psychologist, counseled C.T. at Shriners Hospital in Galveston until March of 2011.  She testified telephonically as to outcries of abuse made by C.T.  According to Dr. Arceneaux, C.T. reported that her father would spank her, but she would not get spankings when she was with her grandmother.  C.T. reported that "she would smell even after she would take a shower, and [Christina] took away her deodorant and toothbrush."  When Dr. Arceneaux asked C.T. why those things were taken away from her, she replied that "[Christina] said that I wanted to be stinky and I don't use them so I don't need them."  C.T. reported that "her parents didn't want anyone talking to her or anyone being close to her because she was stinky, and that they were embarrassed and they didn't want other people around her."  Dr. Arceneaux testified:

> I asked [C.T.] if she felt comfortable telling me what happened the day that she was burned in the shower, and she started crying.  And what she told me was that her dad said it was discipline, and then she said it was technically her fault.  And when I asked her to explain, she talked to me about how she was taking a shower and she was leaving the bathroom and her dad told her that she still smelled and she needed to go back and take a shower.  And as she was crying, she was saying that, you know, that she—she tried to bathe herself really well.  She thought she was clean, but she wasn't.  And when she got back into the shower, she stated that the water was "hot, hot, hot," and she said that she wanted to get out, "but they wouldn't let me."
>
> And her next statement was that, "My dad thought I had soap in my eyes," and that her stepmom "cl[e]nched her teeth and said in a"—this is in quotes—"scary voice, don't get out of the shower."  So I asked [C.T.] why didn't she just get out and she stated that she was afraid of what they would do to her and they wouldn't let her get out. . . .  She stated that they were in the bathroom, but they did not get in the shower with her.  And she

8

> reported that . . . she told her dad and stepmom that it stings, and she was
> unable to remember how she got out of the shower. . . . She reported that
> at the end of the shower that her stepmom turned the water to cold, and
> she stated that she was already burned and it was really hurting.

Dr. Arceneaux explained that her clinical impression at that time was that "[C.T.] was struggling with the guilt of her burn injury being her fault. She repeatedly stated that if she had been a good child and a clean child, they would not have made her take another shower."

C.T. reported several other specific incidents of abuse to Dr. Arceneaux:

- Sometime shortly after the shower incident, when C.T. was "putting away the dishes, and she didn't know where a particular dish went," her father got "really upset with her." According to Dr. Arceneaux, C.T. stated that "'He got really mad and pushed my back up against the wall and yelled at me. . . . He told me I was stinky, slow, and stupid.'" The burns on C.T.'s back had not been treated as of that time.

- Another time, C.T. stopped to use the restroom at a Dairy Queen; when she came back to the family's car, Christina told her that K.T. had thrown up because "[C.T.] smelled like a dead animal." Later that night, Paul "slapped her in the head and said that she was the one that started this shit." Christina then told C.T. that "she wasn't going to stop him this time"—meaning that she would not stop Paul from spanking her. Dr. Arceneaux stated:

  > [C.T.] said that her dad usually spanked her with a belt, but this time he
  > went to the closet and got his work belt. And she said that this was a
  > heavier belt and it hurt worse than the other belt. "It hurt a lot, and he hit
  > me a lot of times, and my dad is really strong." [C.T.] then stated that she
  > was sometimes jealous of her little sister because they would hang out
  > with her little sister, but they didn't do that to her, and that she didn't know
  > why they thought she had to earn it, and that's why they were hitting her.

- Another time, Paul and Christina "told [C.T.] that she needed to change her clothes before going to bed, and she said that she didn't change her clothes." According to

9

Dr. Arceneaux:

> [C.T. said] that her stepmom found her in the bed, "And she told my dad, I think it's time for her beatings now." When I asked her what happened next, [C.T.] said that, "My dad beat me with his duty belt. He kicked me and slapped me in the head. Then he got his paddle and hit me with his paddle, but the paddle broke. And when the paddle broke, he got really, really mad. He kicked me more, and then kicked me in the butt. They both kept asking me why I wasn't crying," but she said it hurt so much that she just screamed. "And every time I do something bad, I get hit."

- C.T "was never allowed to talk about her grandmother when she was with her dad; and she stated that if she ever did mention her grandmother, she would get slapped or hit."

- C.T. once heard Christina saying that one of her cousins "put needles in her arm." When C.T. responded, "'No, she doesn't,'" Paul slapped her in the head.

- C.T. stated that "'My dad spanked me because I didn't vacuum the floor right. . . . I didn't move the furniture to vacuum so [Christina] spanked me three times with the belt, then she told me to place my hands on the wall and not to move my hands and she made me take off my pants because she thought it didn't hurt with my pants on.'"

- Another time, when C.T. could not find clean clothes to wear, Paul spanked her, but C.T. "kept putting [her] hands behind" to block the spanking. Christina then "became angry at her dad and told him to just beat her hands and stop being soft . . . ." C.T. said "'My dad got mad at her and told my stepmom to hit me. . . . [W]hen she was spanking me, I kept moving because my butt was sore; and she accidentally hit my dad with the belt.'" At that point, "'He kicked me in the head and my back, then he went and got his work belt and spanked me for a long time.'"

Dr. Arceneaux initially diagnosed C.T. with acute stress disorder; she then

10

diagnosed her with post-traumatic stress disorder.[8]  A diagnosis of post-traumatic stress disorder requires that the patient suffer "a life threatening event" and show "avoidance":

> [S]he definitely had avoidance where she didn't want to be around anything that reminded her of the burn injury itself.  She did have intense psychological distress at the exposure to anything related to the burn injury.  She had recurrent nightmares and dreams about the events, and she also had intrusive thoughts and images about what happened regarding the traumatic injury itself.

She also stated that C.T. had testified at the criminal trial of Paul and Christina and that the experience was "retraumatizing" for her and caused her to "regress" in her therapy.

Dr. Arceneaux opined that it was in C.T.'s best interest for Paul's and Christina's parental rights to be terminated.  She also noted that C.T. was very adamant in not wanting to be reunited with her biological mother, Alice.

## E.    John Diaz

John Diaz, an investigator for the Department, testified that both children were removed from the custody of Paul and Christina because there was an immediate or imminent danger to the children if they were not removed.

Diaz stated that the last time Alice saw C.T. was when C.T. was six months old. He did not know whether Alice had made an attempt to see C.T. while she was being treated at the burn unit.  According to Diaz, Alice has a "serious" history with the Department, including "one prior termination" of one child and a "permanent managing conservatorship to the father of her other child."  Diaz acknowledged, however, that Alice continued to have joint managing conservatorship of C.T., that Alice had rights to visitation, and that Alice had attempted to exercise those rights according to Department records.

---

[8] Dr. Arceneaux noted that post-traumatic stress disorder can be diagnosed only after four weeks have elapsed since the traumatic event occurred.

**F.    Trisha Ponton**

Trisha Ponton was the Court-Appointed Special Advocate ("CASA") assigned to C.T. and K.T.  She testified that, at the time of trial, K.T. was in the custody of Christina's aunt, Michelle Nunez, and Nunez's husband.  Ponton stated that she has seen K.T.'s interactions with the Nunezes and that "she's very much at home, very stable, very happy . . . ."  Ponton testified that K.T. is "very attached and very settled" to the Nunez family and that it is in her best interest for that situation to become permanent.

Ponton stated that C.T. is in the custody of her paternal grandmother, Myra.[9] She said that Myra's apartment was "adequate" to suit C.T.'s needs.  C.T. is attending school near Myra's apartment and is "making A's and B's and has made friendships again and is very much at home at that school."  Ponton noted that Myra had raised C.T. from the time she was six months old; whereas C.T.'s biological mother, Alice, was not part of her life.  Ponton testified that it would be in the best interest of C.T. to stay in the custody of Myra and for Paul's and Christina's parental rights to be terminated.  On cross-examination, Ponton acknowledged that Myra has a "limited" ability to walk and has "limited" health.

**G.    Donna Enriquez**

Donna Enriquez is the Department caseworker assigned to C.T. and K.T.  She visits each child at least once per month.  She testified that C.T. and K.T. are able to see each other two or three weekends per month, that their current caregivers facilitate the meetings, and that the children are very close to each other.  The Department's

---

[9] "Myra" is a fictitious name.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

permanency plan for both children is adoption by their current caregivers.[10]

Enriquez stated that she repeatedly attempted to make contact with Alice—by sending "[a]pproximately 35" letters to 20 different addresses—but that Alice has not made contact with her. To Enriquez's knowledge, Alice has never provided any sort of support for C.T.; but Enriquez noted that she did not search Nueces County child support records to confirm that.

Service plans established by the Department required each of the three appellants to submit to psychological examinations, participate in counseling, anger management and parenting classes, provide the Department with locating information for themselves and relatives that would be willing to care for the children, and submit to drug and alcohol assessment. According to Enriquez, neither Paul nor Alice completed any of these requirements; Christina failed to complete the anger management and counseling requirements. She believed termination of the parental rights for all three appellants was in the best interest of both children.

### H. Michelle Nunez

Nunez stated that K.T. had been staying with her family for over nine months as of the time of trial. According to Nunez, K.T. is "very attached" to her new family. She calls the Nunezes "mama" and "daddy." K.T. visits C.T. at Myra's apartment once per month and has a good relationship with C.T., although K.T. tends to cry when she gets dropped off. Nunez stated that she wants to adopt K.T. if the jury terminates the parental rights of Paul and Christina.

### I. Paul

Paul testified that he was convicted for causing injury to C.T., but that he is not

---

[10] Enriquez acknowledged that, at one point, K.T. had "fallen off a couch" and "bumped her head" while in the care of Myra.

guilty of those charges. He testified that he got home late on the night of Friday, June 11, 2010, and the family ate dinner, watched TV, and spent time together like they normally would. C.T. went to take a shower; she then had to take another one "[j]ust to make sure that—that she was clean." Paul said: "You know, sometimes I'll take—I'll take one or two showers myself just to make sure I'm fully clean." Paul denied that Christina ordered C.T. to take a second shower because she smelled. He testified:

> Next thing [Christina] was in the kitchen. I was in the living room. Next thing I hear is, "It stings, it stings," and I thought she had gotten soap in her eye, and that's when she yelled out again, "It stings." And in the tone of her voice, I could tell something was wrong. That's when we ran to the shower—to the restroom, I'm sorry, and noticed that the water was hot, was turned all the way to hot. And that's when [Christina] turned the water all the way to cold and turned it off.

When asked how long he thought C.T. was in the hot water before it was turned off, Paul replied: "As soon as she called out the second time, we ran over there. Everything happened so fast I don't know the time." When asked why a 10-year-old child would stay in a scalding hot shower if there was no one preventing her from getting out, Paul replied: "I don't know. I really don't know what's going through her head at that time." After C.T. got out of the shower, Paul said that "[h]er back was fine." The next day, there were "little blisters" on her back. Paul testified: "[T]o me they didn't look that bad because I'm used to seeing things in my—in my line of work in the military."[11]

Paul stated that he learned how to treat burns when he served in the Marines as

---

[11] Paul's counsel presented him with medical records from the Shriners Hospital burn unit that had been entered into evidence. Paul read aloud one report from a June 23, 2010 examination. The report read:

> This young girl has mainly superficial burns. I did not look at her completely in the tub but observed that she has free extremity use; and although she has burns on her feet, they are not functionally threatening. Likewise, the burns in other areas on the body seem to be second degree only and it does not appear that she will be needing any surgical procedures. She says that she is getting along just fine.

14

a field medical technician. He gave C.T. Tylenol every four to six hours. C.T. "showed no signs of pain" or infection and "repeatedly told [Paul] that she wasn't in pain." He purchased burn relief gel and gauze and popped C.T.'s blisters with a needle. According to Paul, "the burns were superficial. . . . There was nothing to indicate that the burns were severe at that time." The next day, Monday, C.T. again acted normally, "showed no signs of pain" and "said she wasn't in pain." On Tuesday, Paul "knew something was wrong. I knew that she had taken a turn for the worse . . . that's when I immediately decided it was time to go to the hospital." Paul added: "It wasn't until that day when I took her to the hospital that I noticed all those bruises."

Paul denied that C.T. was required to do chores, and he denied pushing her up against the wall for not putting away dishes correctly. He did not know why C.T. reported those things to Dr. Arceneaux. He did admit to spanking C.T. as punishment "if she lies or if she gets in trouble, anything that's bad behavior." He said that he would use a belt to whip C.T., but he never used his work belt or a paddle. Paul said that, if he were able to reunite with his daughters after being released from prison, he would no longer use corporal punishment.

Paul stated that C.T. had been living with his mother, Myra, up until February of 2010. At that time, Myra sought court-ordered child support; Paul then sought custody of C.T. and obtained it via court order. Paul denied that he only sought custody of C.T. because his mother, C.T.'s caregiver, had filed for child support. He admitted, however, that he did not make attempts to visit C.T. when she was in Myra's care. In early 2010, the family moved out of a two-bedroom apartment, breaking a lease in the process, and moved into a three-bedroom apartment, which is where the shower incident occurred several months later.

15

Paul testified that he is currently taking the anger management classes that were required of him by the Department's service plan, but he has not finished those classes. Paul stated that he also has not completed the parenting class, psychological exam, or counseling requirements contained in the service plan. He agreed with counsel for the department that, even if he and Christina are paroled as soon as they are eligible, in 2016, they will still be on community supervision for ten years from the time of sentencing, and one of the terms of community supervision is that they "not associate or have any contact with [C.T.] or [her] family." He acknowledged that, unless a court changes those terms, C.T. would be in her twenties by the time Christina and he would be permitted to see C.T. pursuant to the criminal judgment.

## J.    Myra

Myra, Paul's mother, testified that she is 61 years old and is "disabled" in that she has osteoporosis and high blood pressure. She has cared for C.T. "[s]ince she was born." Paul lived with Myra and C.T. while he was serving in the military in North Carolina. C.T. was three years old when the family moved to Texas. At some point, Paul decided to move in with Christina; C.T. stayed with her grandmother. Some time later, Myra told Paul that she needed financial help to continue to support C.T.; however, Paul did not provide any help, so Myra sought assistance from the Attorney General's office in obtaining child support.[12] According to Myra, she was not awarded child support but rather was ordered to return C.T. to Paul within one week. Myra stated that Paul "didn't want me in their life anymore." After C.T. was returned to the custody of her father, Myra was not allowed to see C.T. "because [Christina] didn't want

---

[12] Myra testified that, between the time that Paul moved in with Christina and the time that she sought child support, Paul visited C.T. only once. She further stated that, in 2010, C.T. once asked to speak to her biological mother, Alice, and so Myra called Alice and C.T. was able to speak with her and her maternal grandmother.

16

me to."

C.T. is now living with Myra. Myra received special training at Shriners Hospital to care for C.T.'s injuries. K.T. visits with them every other weekend. There was an incident where K.T. and C.T. were playing and K.T. fell. Myra brought her to the emergency room and called the Department to report the incident. The injury was not serious, and "by the time we got back home, [K.T.] was laughing and grinning." Myra conceded that she practiced corporal punishment on Paul, her son, but would not do so with C.T.

According to Myra, C.T. wants her father and Christina to "leave [her] alone, and let [her] stay" with Myra. Myra intends to adopt C.T. if Paul's parental rights are terminated. She believes that it is in K.T.'s best interest to stay in the custody of the Nunezes.

In discussing the extent to which public assistance funds would be available to assist her in supporting C.T., Myra mentioned that C.T. is "half Indian" because "I'm half Black Foot, and her mom [is] half Cheyenne." Myra claimed that C.T. would be eligible for federal grants for college tuition because of her "Indian blood."

## K.    Vicky Magana

Vicky Magana, a clinical social worker, provided counseling to C.T. since March of 2011. She testified, over objection, that C.T. reported to her that Paul and Christina had abused her physically. According to Magana, C.T. "said that she was beaten on— close to [a] daily basis being slapped, punched, and kicked for what seemed to her two to three hours a day. One time she was handcuffed and then beaten." C.T. reported that Christina "came in one time and said . . . that [Paul] was not beating [C.T.] hard enough and so she started beating her." C.T. reported that Christina "called her

17

derogatory names four to five times a [day]" and fought with Paul on a daily basis.

Magana diagnosed C.T. with "fairly severe" post-traumatic stress disorder. She reached her diagnosis independently from Dr. Arceneaux. She acknowledged on cross-examination that post-traumatic stress disorder may arise from an accidental, as opposed to intentional, trauma.

According to Magana, C.T. wants to be able to visit with her biological mother, Alice, but does not want to live with her, and C.T. has no problem with Myra deciding whether or not she can visit with Alice. She stated it is in C.T.'s best interests for Paul's and Christina's rights to be terminated so her grandmother can adopt her.

## L.     Verdict and Judgment

The jury found by clear and convincing evidence that both Paul and Christina violated parts (D), (E), (L), (O) and (Q) of family code subsection 161.001(1). *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (permitting involuntary termination of parental rights on grounds that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child"); *id.* § 161.001(1)(E) (permitting termination on grounds that parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child"); *id.* § 161.001(1)(L)(ix) (permitting termination on grounds that parent has "been convicted or has been placed on community supervision . . . for being criminally responsible for the death or serious injury of a child" under penal code section 22.04); *id.* § 161.001(1)(O) (permitting termination on grounds that parent failed to comply with family service plan); § 161.001(1)(Q) (permitting termination on grounds that parent knowingly engaged in criminal conduct that resulted in the parent's conviction and confinement "for not less

18

than two years from the date of filing the petition").

The jury also found by clear and convincing evidence that Alice had violated parts (N) and (O) of subsection 161.001(1). *See id.* § 161.001(1)(N) (permitting termination on grounds that the parent "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months, and: (i) the [Department] or authorized agency has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment"); *id.* § 161.001(1)(O).

The jury determined that termination of the appellants' parental rights was in the best interests of the children, and the trial court rendered judgment on the verdict. This appeal followed.

## II. DISCUSSION

### A. Personal Jurisdiction Over Alice

We first address Alice's fourth issue, in which she argues that the trial court lacked personal jurisdiction over her because she was never served with process, either by personal service or by publication. *See id.* § 102.009(a)(7) (West Supp. 2011) (requiring service of citation on "each parent as to whom the parent-child relationship has not been terminated or process has not been waived under Chapter 161"); *id.* § 102.009(c) (providing that "[c]itation . . . shall be issued and served as in other civil cases). Alice further argues that the appearance of her court-appointed counsel at trial did not constitute a general appearance which would waive service of citation. *See* TEX. R. CIV. P. 120.

19

If a trial court enters a judgment without acquiring personal jurisdiction over the parties, the judgment is void. *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985). Moreover, because an involuntary termination of parental rights involves fundamental constitutional rights, we must exercise the utmost care in ensuring that a parent's rights are acknowledged and protected. *Velasco v. Ayala*, 312 S.W.3d 783, 798 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

A party waives service of process if it makes a general appearance. TEX. R. CIV. P. 120 (providing that the entrance of a general appearance "shall have the same force and effect as if the citation had been duly issued and served as provided by law"); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) ("[T]he personal jurisdiction requirement is a waivable right."). A party enters a general appearance when it: (1) invokes the judgment of the court on any question other than the court's jurisdiction; (2) recognizes by its acts that an action is properly pending; or (3) seeks affirmative action from the court. *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004).

The Department filed its petition seeking termination of appellants' parental rights on June 16, 2010. The same day, the trial court rendered temporary emergency orders appointing counsel for each of the three appellants and granting custody of both children to the Department until a full adversary hearing could be held. *See* TEX. FAM. CODE ANN. § 262.205 (West 2008). The adversary hearing took place on June 30, 2010.[13] Following the hearing, the trial court rendered another temporary order granting custody to the Department and requiring appellants to comply with the service plans

---

[13] The record does not contain a transcript of the June 30, 2010 adversary hearing.

established by the Department. The temporary order stated that "Respondent Mother [Alice] appeared through attorney of record . . . and announced ready."

In a "Report of Attorney ad Litem" filed with the trial court on February 11, 2011, Alice's court-appointed counsel stated that he "has been unable to contact [Alice]" but notes that "[Alice] did participate in an earlier hearing via telephone, but that telephone number is currently disconnected." In another "Report of Attorney ad Litem" filed on April 12, 2011, counsel stated that he "has been in telephonic contact with [Alice]" and that "[Alice] has requested a jury trial in the pending termination suit and expresses an interest in any services that might be offered her by the Department." Both reports were signed by Alice's court-appointed counsel. Counsel also fully participated at trial, examining each witness, presenting pre-trial motions and presenting opening and closing arguments.

It has been held that, while a defendant's personal appearance before a court generally indicates a submission to the court's jurisdiction, the mere presence in court by an attorney retained as counsel by a party does not constitute a general appearance by the party, unless the attorney seeks a judgment or an adjudication on some question. *Mays v. Perkins*, 927 S.W.2d 222, 225 (Tex. App.—Houston [1st Dist.] 1996, no writ) (construing TEX. R. CIV. P. 120). We agree with this construction of the applicable rule. Here, Alice never appeared before the court in person, but she did participate in a hearing via telephone, according to counsel's February 11, 2011 report. Moreover, her counsel made requests on her behalf—including a request for a jury trial according to counsel's April 12, 2011 report—and he sought judgment denying the Department's petition for termination of parental rights on Alice's behalf. Counsel participated at the adversary hearing and at trial. Under these circumstances, we conclude that counsel

21

entered a general appearance that waived service of process on Alice. Further, having reviewed the record, we find that counsel's representation was sufficient to protect Alice's fundamental constitutional rights. The trial court therefore properly exercised personal jurisdiction over Alice. Her fourth issue is overruled.

## B. Evidentiary Sufficiency

All three appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings.

### 1. Applicable Law and Standard of Review

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). Termination must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

Before terminating parental rights, the trier of fact must find that the parent committed an act prohibited by subsection 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. *Id.* § 153.002 (West 2008); *id.* §

22

161.001; *see In re J.L.*, 163 S.W.3d at 84. The following non-exhaustive list of factors is considered in determining whether parental termination is in the child's best interest: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking parental termination is not required to prove all nine factors. *In re C.H.*, 89 S.W.3d at 27; *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App.—Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate."). In some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 27.

In reviewing the legal sufficiency of the evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *Id.* We must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency, we must give due deference to the findings of the trier of fact and must not supplant the judgment with our own. *In re*

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could have reasonably formed a firm conviction or belief that the parent violated the relevant conduct provision of subsection 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

### 2. Termination of Paul's Parental Rights

By his first issue, Paul contends that the evidence was legally and factually insufficient to support the jury's separate findings that he violated parts (D), (E), (L), (O) and (Q) of family code subsection 161.001(1). *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (L)(ix), (O), (Q). By his second issue, Paul contends that the evidence was insufficient to support the finding that termination of his parental rights was in the children's best interests.

We first address the finding made under part (L). That section provides that termination of parental rights may be based on grounds that the parent has "been convicted or has been placed on community supervision . . . for being criminally responsible for the death or serious injury of a child under," *inter alia*, section 22.04 of the penal code. *See id.* § 161.001(1)(L)(ix).

The evidence at trial, including Paul's own testimony, established that Paul was convicted on five separate felony counts under section 22.04. *See* TEX. PENAL CODE ANN. § 22.04. The convictions were for two first-degree felony counts and three third-degree felony counts. *See id.* Paul was sentenced to prison terms of twelve, ten, ten, five, and two years.[14] Paul concedes that he was convicted but argues that the

---

[14] The twelve-year and two-year sentences, along with one of the ten-year sentences, were ordered to run concurrently. The other ten-year sentence and the five-year sentence were suspended and Paul was placed on community supervision for ten years.

24

requirements of part (L) of subsection 161.001(1) were not met because he was not convicted of causing "serious" bodily injury to C.T. *See* TEX. FAM. CODE ANN. § 161.001(1)(L)(ix).

It is true, as Paul argues, that "serious" injury to the victim may not have been among the elements required to convict Paul under section 22.04. *See* TEX. PENAL CODE ANN. § 22.04.[15] We nevertheless conclude that the evidence supported a finding that the injuries he caused were "serious" in this case.[16] It is undisputed that the injuries which Paul was convicted of causing were the second- and third-degree burns suffered by C.T. on June 12, 2010. The evidence established that those burns covered approximately 22.5% of C.T.'s body, including a 60-by-40-centimeter burn on her back

---

[15] The indictments filed against both Paul and Christina alleged seven counts of intentionally or knowingly causing injury to C.T. The first two counts specifically alleged that Paul and Christina had caused "serious bodily injury" to C.T. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e), (f) (West Supp. 2011) (providing that intentionally or knowingly causing "serious bodily injury" to a child is a first-degree felony, whereas intentionally or knowingly causing mere "bodily injury" to a child is a third-degree felony). Both Paul and Christina were convicted on, among others, counts one and two. However, because the criminal jury charge is not part of the record before this Court, we cannot say definitively that Paul and Christina were convicted under section 22.04 for causing "serious" bodily injury; that is, it is possible that the counts on which Paul and Christina were convicted were not identical to those alleged in the indictment. For purposes of this opinion, we will therefore assume that a showing of "serious" bodily injury was not necessary to convict Paul or Christina.

[16] In a recent memorandum opinion, the First District Court of Appeals noted that the family code does not define "serious injury" but that the dictionary defines it as an injury "having important or dangerous possible consequences." *C.H. v. Dep't of Family & Protective Servs.*, Nos. 01-11-00385-CV, 01-11-00454-CV & 01-11-00455-CV, 2012 Tex. App. LEXIS 1382, at *16–17 (Tex. App.—Houston [1st Dist.] Feb. 23, 2012, pet. denied) (mem. op.) (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 1050 (1981)).

Further, in *In re L.S.R.*, the Texas Supreme Court suggested that the elements of part (L) of family code subsection 161.001(1) were satisfied even though the crime appellant was convicted of did not require a showing that the victim suffered "serious" injury. 92 S.W.3d 529, 530 (Tex. 2002) (per curiam). In that case, the appellant was convicted of indecency with a child. *Id.* The Court of Appeals affirmed the termination of appellant's parental rights but deleted grounds under part (L), noting that there was "no showing that [the victim] suffered death or serious injury as a result of [appellant's] conduct." *Id.* The Supreme Court denied appellant's petition for review but "disavow[ed] any suggestion that molestation of a four-year-old, or indecency with a child, generally, does not cause serious injury." *Id.* Here, viewing all the evidence, we similarly find that Paul was convicted for causing C.T. to suffer "serious" injury even though the crime he was convicted of did not necessarily require a showing of "serious" injury.

25

and burns on her thighs, buttocks, and feet. One day later, Christina described the appearance of the burns as a "horror show." When C.T. was finally taken to the hospital for treatment, she was evacuated by helicopter to a specialized burn unit in a hospital hundreds of miles away, in Galveston, where she was kept in the intensive care unit for nearly two weeks. The burns required months of treatment and physical therapy. In short, the evidence plainly allowed a reasonable fact-finder to form a firm conviction or belief that C.T.'s injuries were indeed "serious" and that Paul was convicted of causing them. Accordingly, the evidence was legally and factually sufficient to support the jury's finding under part (L) of family code subsection 161.001(1).[17]

We must next determine whether the jury's finding as to the best interests of the children was supported by sufficient evidence. We find that it was. Dr. Arceneaux testified that C.T. reported multiple instances of abuse at the hands of Paul. In particular, C.T. reported to Dr. Arceneaux that, after she had been burned, Paul "got really mad" at her for failing to put dishes away properly and "pushed [her] back up against the wall and yelled at [her]"; she reported that Paul "hit [her] a lot" with his work belt; she reported that Paul "kicked [her] and slapped [her] in the head" and hit her with "his paddle." Magana also testified that C.T. made outcries of abuse to her. C.T. told Magana that that she was being beaten on "close to [a] daily basis . . . for what seemed to her two to three hours a day" and that she was once "handcuffed and then beaten."

---

[17] We note that our conclusion as to this evidence is also applicable to the termination of Paul's parental rights to K.T. Part (L) of section 161.001(1) merely requires a showing that the parent was convicted of causing serious injury to "a" child—not necessarily the child subject to termination proceedings. See TEX. FAM. CODE ANN. § 161.001(1)(L) (West Supp. 2011). Therefore, the fact that Paul was convicted of causing serious injury to C.T. satisfies the statute with regard to the termination of his parental rights to K.T.

Moreover, because the evidence was sufficient to support the jury's finding that Paul violated part (L) of family code subsection 161.001(1) with respect to both children, we need not address whether the evidence was sufficient to support the jury's findings under parts (D), (E), (O), and (Q) of that section. See TEX. R. APP. P. 47.1.

Although Paul denies these accusations, the fact finder enjoys the exclusive right to resolve credibility issues and conflicts within the evidence. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). It may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* The jury in this case could have reasonably believed C.T.'s outcries, as relayed by Dr. Arceneaux and Magana, and it could have reasonably disbelieved Paul's denials. *See id.*; *see also Holley*, 544 S.W.2d at 372 (noting that one factor to consider in determining best interests is "the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper").

Other evidence supporting the jury's finding as to the children's best interest included: Dr. Arceneaux's and Magana's diagnoses of C.T. as suffering post-traumatic stress disorder because of the shower incident; Ponton's testimony that C.T. is thriving under the care of Myra and that K.T. is "very stable" and "very happy" with the Nunezes; and Enriquez's testimony that C.T. and K.T. are able to see each other regularly and that their caregivers facilitate the visitation. *See id.* (noting that the emotional and physical danger to the child now and in the future and the stability of the home or proposed placement are factors in determining best interests).

Considering the nine factors as set forth by the Texas Supreme Court in *Holley*, *see id.,* we conclude that a reasonable fact-finder could have formed a firm belief or conviction that termination of Paul's parental rights was in the best interests of both children. Paul's first and second issues are overruled.

### 3. Termination of Christina's Parental Rights

Christina, by her first issue on appeal, contends that the evidence was legally and factually insufficient to support the jury's separate findings that she violated parts

(D), (E), (L), (O) and (Q) of family code subsection 161.001(1). *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (L)(ix), (O), (Q). She contends by her second issue that the evidence was insufficient to support the finding that termination of her parental rights was in the children's best interests.

Again, we first address the jury's finding that Christina violated part (L) of subsection 161.001(1). The evidence established that Christina and Paul were tried together for causing injury to C.T. and were convicted. Christina was convicted on two first-degree felony counts and two third-degree felony counts, and she was sentenced to prison terms of thirteen, seven, five, and two years.[18] The evidence also shows, as it does for Paul, that Christina's conviction was for causing "serious" injury to C.T. *See id.* § 161.001(1)(L)(ix). The evidence was therefore legally and factually sufficient to support the jury's finding that Christina violated part (L) of family code subsection 161.001(1).[19]

The evidence was also sufficient to support the jury's finding that termination of Christina's parental rights was in K.T.'s best interests. With respect to the shower incident, Dr. Arceneaux testified that C.T. reported that Christina ordered her not to get out of the shower, even though the water was hot enough to burn. Christina's own testimony established that, although she saw what she described to police as a "horror show" of blisters on C.T.'s back, she did not initially take C.T. to the hospital for treatment. Christina conceded that one of the reasons she did not immediately take

---

[18] The thirteen-year and seven-year sentences were ordered to run concurrently. The five-year and two-year sentences were suspended and Christina was placed on community supervision for ten years.

[19] Again, this finding is applicable to the termination of Christina's rights as to K.T., even though the conviction was for causing injury to C.T. *See supra* n.17. And again, because there is sufficient evidence to support the jury's finding that Christina violated part (L) of family code subsection 161.001(1), we need not address whether the evidence was sufficient to support the jury's findings under parts (D), (E), (O), and (Q). *See* TEX. R. APP. P. 47.1.

28

C.T. to the hospital was that she had recently suffered a miscarriage and was not allowed to lift heavy items or walk up stairs. C.T. also told Dr. Arceneaux that Christina once became angry at Paul and "told him to just beat [C.T.'s] hands and stop being soft." According to Magana, C.T. reported that Christina "came in one time and said . . . that [Paul] was not beating [C.T.] hard enough and so she started beating her." C.T. also told Magana that Christina frequently "called her derogatory names." Ponton testified that K.T. is happy and stable in her current custody arrangements. All of this evidence is relevant to the question of K.T.'s best interests and supports the jury's finding. *See Holley*, 544 S.W.2d at 372 (stating that factors to consider in determining best interests include: the emotional and physical danger to the child now and in the future; the parenting abilities of the parties; the stability of the home or proposed placement; and the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper).

Viewing all the evidence in light of the *Holley* factors, we conclude that a reasonable juror could have formed a firm belief or conviction that the termination of Christina's parental rights was in the best interests of K.T. We overrule Christina's first two issues.

### 4. Termination of Alice's Parental Rights

By her first two issues on appeal, Alice argues that the evidence was legally and factually insufficient to support the jury's findings that she violated parts (N) and (O) of family code subsection 161.001(1).[20]

---

[20] We note that the trial court's final judgment stated that Alice violated parts (C) and (O) of the statute. *See* TEX. FAM. CODE ANN. § 161.001(1)(C) (permitting termination on grounds that the parent "voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months"). However, the jury charge asked only whether Alice violated parts (N) and (O). It is therefore apparent that the trial court erred in stating in its final judgment that Alice violated part (C). We will modify the judgment to reflect instead the jury's

We first address whether the evidence was sufficient to support the finding under part (N). That part permits termination of parental rights if the parent:

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months, and:
>
> (i)     the [Department] or authorized agency has made reasonable efforts to return the child to the parent;
>
> (ii)    the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii)   the parent has demonstrated an inability to provide the child with a safe environment . . . .

TEX. FAM. CODE ANN. § 161.001(1)(N). Alice concedes: (1) that C.T. has "been in the permanent or temporary managing conservatorship of the [Department] for not less than six months"; (2) that the Department made reasonable efforts to return C.T. to her; and (3) that she has not "regularly visited or maintained significant contact with" C.T. She disputes only the evidence supporting the third prong under part (N); i.e., that she "demonstrated an inability to provide the child with a safe environment." *See id.* § 161.001(1)(N)(iii).

Alice argues that "there was no evidence indicating that [she] knew about the service plan adopted by the Court, that she did not attempt to find a place for C.T., that she did not provide support for C.T., or any other factor displaying instability on the part of [Alice]." The record, however, shows that: (1) Alice did not complete any of the requirements of the service plan established for her by the Department and ordered by the court; (2) the Department sent Alice approximately 35 letters to 20 different addresses in an attempt to reach Alice, but Alice never responded; (3) Alice had made contact with C.T. only once in nine-and-a-half years; and (4) Alice had her parental

---

conclusion that Alice violated parts (N) and (O). *See* TEX. R. APP. P. 43.2(b).

30

rights to a second child terminated and lost permanent custody of a third child. This evidence was sufficient to allow a reasonable trier of fact to form a firm belief or conviction that Alice was unable to provide C.T. with a safe environment. *See id.*[21]

Alice does not contend, on appeal, that the evidence was insufficient to support the jury's finding that termination of her parental rights was in C.T.'s best interests; accordingly, we do not address that issue. We overrule Alice's first and second issues.

## C.    ICWA Notice and Verification

Paul, by his seventh issue, and Alice, by her third issue, each contend that the trial court violated ICWA's verification and notice provisions. Paul and Alice argue that we must therefore remand the case to the trial court so that proper notice and verification can be sought and a hearing may be conducted to determine whether C.T. (and K.T., in the case of Paul) are "Indian" children under ICWA.

ICWA was enacted by Congress in 1978 in response to "an alarmingly high percentage of Indian families" who are "broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and the "alarmingly high percentage of such children" who were being "placed in non-Indian foster and adoptive homes and institutions." *Doty-Jabbaar v. Dallas County Child Protective Servs.*, 19 S.W.3d 870, 874 (Tex. App.—Dallas 2000, pet. denied) (quoting 25 U.S.C. § 1901(4)). ICWA applies to all state child custody proceedings involving an Indian child when the court "knows or has reason to know" that an Indian child is involved. *Id.* (citing 25 U.S.C. § 1912(a)); *see Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 162 (Tex. App.—Houston [14th Dist.] 1995, no writ). An "Indian child" is defined in ICWA as an

---

[21] Because we find that the evidence was sufficient to support the jury's finding that Alice violated part (N) of subsection 161.001(1), we need not address whether the evidence was also sufficient to support the finding that Alice violated part (O) of that statute. *See* TEX. R. APP. P. 47.1.

"unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Subsection 1912(a) of ICWA provides:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

*Id.* § 1912(a).

Paul and Alice argue that the trial court "ha[d] reason to know that an Indian child" was involved in the case—and the notice and verification requirements of subsection 1912(a) were therefore applicable—because of Myra's testimony that C.T. is "half-Indian." The Department, for its part, agrees that the case should be abated and remanded to the trial court for a determination as to whether ICWA applies.

We disagree that the case should be remanded or abated, however, because we do not believe that the trial court "kn[e]w or ha[d] reason to know that an Indian child" was involved in the case. *See id.* The only evidence adduced regarding C.T.'s heritage was Myra's statement that Myra is "half Black Foot" and that Alice is "half Cheyenne." She did not state that either Alice, Paul, C.T., K.T., or herself were "members" of an Indian tribe, and she did not state that either child would be "eligible for membership" in

32

an Indian tribe. *See id.* § 1903(4) (defining "Indian child" as a person under eighteen who either: (a) is a member of an Indian tribe; or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe); *see also In re Trever I.*, 973 A.2d 752, 758 (Me. 2009) (noting that "the party asserting the applicability of the ICWA has the burden to provide sufficient information to at least put the court or Department on notice that the child may be an 'Indian child,' within the meaning of the ICWA, and that further inquiry is necessary"); *In re Arianna R.G.*, 657 N.W.2d 363, 370 (Wis. 2003) (holding that ICWA notice provisions did not apply because "the information available to the court was too vague for the court to have reason to know" that children were Indian where only evidence was father's statement that his children have "Indian heritage" and that their "ancestry stems from the Ojibwa Tribe in Marinette, Wisconsin").

Paul's seventh issue and Alice's third issue are overruled.

## D.    Admission of Evidence

Paul argues by three issues that the trial court erred by admitting certain evidence. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). Even if the trial court abused its discretion, we may only reverse the judgment on that basis if the error probably caused the rendition of an improper judgment or prevented Paul from properly presenting his appeal. TEX. R. APP. P. 44.1(a).

By his eighth issue, Paul contends that the trial court erred in allowing Dr. Arceneaux to testify as to whether she believed the outcries of abuse made by C.T. Counsel for the Department asked Dr. Arceneaux: "Do you believe [C.T.] and the statements she made to you?" Paul's counsel objected to the question, stating "[t]hat's for the fact finder to decide if the person is believable." Counsel for the Department

33

rephrased her question as follows: "Do you find [C.T.]'s statements to be reliable?" Paul's counsel objected again on the same grounds but the trial court overruled the objection. Dr. Arceneaux replied: "I do find her statements to be reliable." Paul claims that this testimony was inadmissible under *Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993) (holding that "expert testimony that a particular witness is truthful is inadmissible" under Texas Rule of Evidence 702). *But cf.* TEX. R. EVID. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").

Assuming, without deciding, that the trial court erred by admitting this testimony, we nevertheless conclude that Paul has not shown that he suffered harm as a result of the error. In conducting a harm analysis, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *In re D.O.*, 338 S.W.3d 29, 38 (Tex. App.—Eastland 2011, no pet.). Here, the record is replete with other evidence—including testimony by Detective Ilse, Denney, Diaz, Ponton, Enriquez, and Magana—supporting C.T.'s version of events. This testimony therefore rendered duplicative Dr. Arceneaux's testimony that C.T.'s outcries were "reliable." *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) ("[E]rror in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection."); *see also Castillo v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00498-CV, 2006 Tex. App. LEXIS 6700, at *15 (Tex. App.—Austin July 28, 2006, no pet.) (mem. op.) (concluding that the admission of evidence of child describing abuse was harmless where "numerous witnesses testified about [the child's] allegations").

Paul contends that there is a "reasonable possibility that the jury could have heavily relied on the opinion of the doctor that the child's statements were truthful and reliable," especially given the fact that C.T. did not testify at trial. However, even if that were true, a "reasonable possibility" that the admitted testimony was dispositive is not enough to show harm. Paul bore the burden to show that the judgment in this case "turned on" the admitted evidence. *See In re W.E.C.*, 110 S.W.3d 231, 248 (Tex. App.—Fort Worth 2003, no pet.) ("A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted."). He failed to meet his burden here. Paul's eighth issue is overruled.

By his ninth issue, Paul contends that the trial court erred in admitting, over his counsel's objection, Magana's testimony regarding C.T.'s outcries of abuse. He claims that Magana's testimony was "cumulative" of Dr. Arceneaux's previous testimony. *See* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."). We disagree that the trial court erred in admitting the testimony. The record reflects that C.T. made her initial outcries to Dr. Arceneaux while being treated in Galveston; later, after C.T. had been transferred to a hospital in Corpus Christi, she began therapy with Magana and made separate reports of the same events. This testimony was probative, and we do not believe its probative value was substantially outweighed by any unfair prejudice caused by the admission of the testimony. *See id.* Moreover, although Paul objected to Dr. Arceneaux's statement as to the reliability of C.T.'s reports, he does not object generally to the doctor's testimony

35

as to the reports of abuse made by C.T.[22]  Accordingly, any error in admitting Magana's testimony is harmless.  *See Volkswagen of Am., Inc.*, 159 S.W.3d at 907.

Paul additionally contends by his ninth issue that "cumulative error" deprived him of a fair trial.  The doctrine of cumulative error provides that a reviewing court may reverse a lower-court judgment when the record shows a number of instances of error, "no one instance being sufficient to call for a reversal, yet all the instances taken together may do so."  *Country Village Homes, Inc. v. Patterson*, 236 S.W.3d 413, 449 (Tex. App.—Houston [1st Dist.] 2007, pet. granted, judgm't vacated w.r.m.).  To show cumulative error, an appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it.  *See Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 810 (Tex. App.—Dallas 1987, no writ).  Having reviewed the record, and even assuming that the trial court erred in admitting the challenged testimony, we do not believe that the jury would have rendered a verdict favorable to Paul but for those errors.  We overrule Paul's ninth issue.

By his tenth issue, Paul contends that the trial court erred in admitting "unsupported speculative testimony" from Detective Ilse regarding whether C.T. was a "targeted child" in the home based on his initial investigation of the case.  *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less

---

[22] The trial court admitted Dr. Arceneaux's testimony regarding C.T.'s reports of abuse after conducting a hearing outside the presence of the jury.  *See* TEX. FAM. CODE ANN. § 104.006 (West 2008) ("In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and . . . the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.").  Paul does not contend on appeal that the trial court erred in making that determination.

36

probable."). As noted, Detective Ilse testified that the difference in appearance of the rooms of C.T. and K.T. was a "red flag" and that C.T. may have been "targeted" because she, unlike K.T., is not related to Christina. Paul notes that subsequent testimony indicated that the family had recently moved into their apartment and that they had already picked out furnishings for C.T.'s room but had not yet purchased them.

Detective Ilse testified that he had investigated over one hundred child abuse cases in 2011 alone and that he has received specialized training in recognizing physical abuse of children. His comments regarding C.T.'s potential status as a "targeted child" were based on that experience and were, therefore, not entirely speculative. Even so, assuming but not deciding that the admission of this testimony was error, we conclude that the error was harmless in light of the evidence that Paul and Christina were responsible for physical abuse and medical neglect of C.T. The jury would likely have reached the same conclusion regarding grounds for termination in the absence of Detective Ilse's testimony. *See* TEX. R. APP. P. 44.1(a). Paul's tenth issue is overruled.

### E.    Right to Fair Trial

Paul, by his eleventh issue, contends that he was deprived of his Sixth Amendment right to a fair trial with an unbiased jury because the Department's counsel revealed during trial that she was acquainted with one of the jurors. Specifically, at the end of the fourth day of trial, the Department's counsel stated:

> As I was doing jury selection, I thought there was someone that I might know on the jury, but he didn't say anything. I don't know him that well. He has been selected. While I was sitting here, my friend sends me a text and asked me if [the juror] is on our jury because he posted on Facebook he's been on a jury for four days.

> And so I thought that I needed to bring that to the Court's attention. I don't have his phone number. I am friends on Facebook. Of course, I have not

37

posted anything on Facebook, but I felt that I needed to bring that to the Court's attention.

The following morning, the Department's counsel informed the trial court that the entire content of the juror's Facebook post was: "Lunch alone at the Surf Club, fourth day of jury duty on a high profile trial." Counsel also read out five separate responses to the Facebook post, none of which mentioned or alluded to anything about the case. At that point, Alice's counsel and Christina's counsel each stated that they had no objection and the trial court stated: "Yeah, I think that's okay." Paul's attorney did not object. At no time did any party object to participation of the juror, either on Sixth Amendment grounds or on any other grounds.

To preserve a complaint for appellate review, a party must complain to the trial court by a timely request, objection, or motion. TEX. R. APP. P. 33.1(a)(1); *Mansions in the Forest, L.P. v. Montgomery County*, 365 S.W.3d 314, 317 (Tex. 2012). Even constitutional complaints must be preserved. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003). The Texas Supreme Court has stated that, in the context of terminating parental rights, "adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose." *In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003). "Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution." *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003); *see In re J.F.C.*, 96 S.W.3d 256, 304 (Tex. 2002) (Schneider, J., dissenting) ("Texas's preservation of error rules promote the child's interest in a final decision and thus placement in a safe and stable home, because they preclude appellate courts from unduly prolonging a decision by appellate review of issues not properly raised in the trial court."). Here, Paul did not preserve his complaint by making

a timely request, objection, or motion; and he has not presented on appeal any reason for this Court to deviate from the general rule requiring preservation of error. His eleventh issue is overruled.

## F.      Jury Charge Error

Christina contends by her seventh issue that the trial court erred, depriving her of her due process rights, "by deviating from the statutory language in Questions 10 and 11" of the jury charge. Question 10 of the jury charge asked whether Christina "knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Question 11 asked whether Christina "engaged in conduct or knowingly placed a child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." The jury answered "yes" to both questions. However, as Christina notes, these questions do not precisely track the language of family code subsection 161.001(1). In particular, the language of the statute makes clear that it must be the child subject to termination—not any child—whose physical or emotional well-being is endangered in order for this section to be satisfied. *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (permitting termination on grounds that the parent "knowingly placed or knowingly allowed *the* child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" (emphasis added)); *id.* § 161.001(1)(E) (permitting termination on grounds that the parent "engaged in conduct or knowingly placed *the* child with persons who engaged in conduct which endangers the physical or emotional well-being of the child" (emphasis added)). The jury charge therefore erroneously allowed the jury to find that Christina violated parts (D) or (E) of subsection 161.001(1) without specifically finding that it was C.T. whose physical or emotional well-being was

39

endangered. The Department argues that Christina failed to preserve this issue because her counsel did not object to the jury charge at trial.

Even assuming that the jury charge was erroneous and that the error was preserved, we conclude that any error would be harmless and therefore not reversible. We have already concluded that the evidence was legally and factually sufficient for the jury to have concluded that Christina violated part (L) of subsection 161.001(1). *See id.* § 161.001(1)(L)(ix) (permitting termination on grounds that the parent was convicted of causing injury to a child under penal code section 22.04). Therefore, even if questions 10 and 11 of the jury charge perfectly mirrored the statute, and even if the jury answered "no" to those questions as a result, the outcome of the proceedings would not have been different. *See* TEX. R. APP. P. 44.1(a). Christina's seventh issue is overruled.

## G. Ineffective Assistance of Counsel

By her eighth issue, Christina contends that her counsel provided ineffective assistance at trial because he failed to object to questions 10 and 11 of the jury charge for the reasons previously discussed in our analysis of Christina's seventh issue.

In a suit filed by a governmental entity seeking termination of parental rights, indigent parents who respond in opposition to the termination are entitled to the appointment of counsel to represent their interests. TEX. FAM. CODE ANN. § 107.013(a)(1) (West Supp. 2011). This statutory right to the appointment of counsel necessarily embodies the right to effective assistance of counsel at every critical stage of the proceeding. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). To establish ineffective assistance, the movant must show: (1) counsel's performance was deficient; and (2) there is a reasonable probability that, but for counsel's deficient performance,

40

the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)).

We have already determined that, even if Christina preserved her issue regarding jury charge questions 10 and 11, there is no reversible error. Accordingly, she cannot show that, but for her counsel's performance, the result of the proceeding would have been different. *See id.* We overrule her eighth issue.

### III. CONCLUSION

The judgment of the trial court is affirmed with respect to appellants Paul and Christina. With respect to appellant Alice, we modify the trial court's judgment to reflect the jury's finding that Alice violated parts (N) and (O) of family code subsection 161.001(1), rather than parts (C) and (O), and we affirm the judgment as modified. *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
27th day of December, 2012.

41